IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

McALLEN DIVISION

| | | |
|---|---|---|
| UNITED STATE OF AMERICA | § | CASE NO. 7:20-CR-01675-1 |
| | § | McALLEN, TEXAS |
| VERSUS | § | THURSDAY, |
| | § | SEPTEMBER 24, 2020 |
| GILBERTO MOLINA | § | 3:59 P.M. TO 4:49 P.M. |

PRELIMINARY HEARING (VIA ZOOM)

BEFORE THE HONORABLE PETER E. ORMSBY
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:                        SEE NEXT PAGE

ELECTRONIC RECORDING OFFICERS:      SANDRA A. SILVA

OFFICIAL INTERPRETERS:              WOODY LEWIS
                                    NOE MURILLO

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

<u>APPEARANCES (VIA ZOOM)</u>:


FOR THE PLAINTIFF, UNITED          OFFICE OF THE US ATTORNEY
STATES OF AMERICA:                 Kristina M. Pekkala, Esq.
                                   1701 US 83 Business
                                   Suite 600
                                   McAllen, TX 78501
                                   956-618-8010


FOR DEFENDANT, GILBERTO            FEDERAL PUBLIC DEFENDERS OFC.
MOLINA:                            Michelle L. Taylor, Esq.
                                   1701 US 83 Business
                                   Suite 405
                                   McAllen, TX 78501
                                   956-630-2995


ALSO PRESENT:                      DANIEL MATA, USPO

INDEX

| WITNESSES: | Direct | Cross | Redirect | Recross | VOIR DIRE |
|---|---|---|---|---|---|
| CARLOS SOTO | | | | | |
| By Ms. Pekkala | 7 | . | . | . | . |
| By Ms. Taylor | . | 23 | . | . | . |

| EXHIBITS: | Marked | Offered | Admitted |
|---|---|---|---|
| (None offered.) | | | |

...

1    McALLEN, TEXAS; THURSDAY, SEPTEMBER 24, 2020; 3:59 P.M.

2    THE COURT:  Let me ahead and call the case number

3    here, it's Magistrate Number M-20-1895, the United States

4    versus Gilberto Molina.

5    MS. PEKKALA:  Kristina Pekkala on behalf of the

6    Government, present and ready.

7    MS. TAYLOR:  Your Honor, Michelle Taylor on behalf

8    of Mr. Molina, who's present and ready.  (Indiscernible) deal

9    conference and he is consenting to do so.  He does not need

10   the services of an interpreter.

11   THE COURT:  Okay.  And thank --

12   MS. TAYLOR:  And, Your Honor --

13   THE COURT:  Sorry.

14   MS. TAYLOR:   -- for the Record I have had a chance

15   to go over a copy of the criminal complaint with Mr. Molina,

16   and believe he understands the allegations.  At this time he

17   will be requesting both his -- well, both his preliminary and

18   his detention hearing.  We may have to continue the detention

19   hearing.  The Pretrial Services report does indicate that his

20   biographical information has not yet been corroborated.  But

21   we're ready to proceed on the preliminary hearing.

22   THE COURT:  All right.  So we'll go ahead and

23   proceed with that then.  And as to -- and unfortunately --

24   well, I guess we'll just have to see how Mr. Gonzalez wishes

25   to proceed because unfortunately the set up doesn't allow us

1    to have a -- two Defendants that one -- where one needs an

2    interpreter and one does not.  So we'll proceed with

3    Mr. Molina.

4                And, Ms. Pekkala, did you wish to call the witness?

5                MS. PEKKALA:  Yes, Your Honor.  And just to clarify,

6    are the -- is the Court proceeding only on the probable cause

7    hearing at this time or is both probable cause and detention?

8                THE COURT:  Well, so are you saying you want a

9    continuance on the bond hearing, Ms. Taylor, or are you saying

10   we might need one, I wasn't quite sure.

11               MS. TAYLOR:  Yes, Your Honor, I believe I'll need a

12   continuance on the bond hearing.

13               THE COURT:  Okay.  And I think that would be

14   appropriate because the information right now it would be very

15   difficult to set a bond.  So once we determine whether there's

16   probable cause, then I'll go ahead and then set a date to

17   continue the bond hearing.

18               And I do know it is appropriate, Mr. Molina, to

19   agree to proceed by video conference.  As I explained to you

20   the other day, it seems to be the safest course based on what

21   the medical experts are telling us.  And we are going to be

22   handling your case in the same way as if you've been here

23   present in the courtroom.  There's really not going to be

24   anything different as far as what's said or what's done.  So,

25   and, Mr. Molina, are you okay to stand as we go through this

1   hearing, or do you need to -- would it be better if you had a
2   chair there to sit in?  What would you prefer, sir?
3            DEFENDANT MOLINA:  Well, it doesn't matter, I can
4   stand.
5            THE COURT:  Okay.  And so if you could just let
6   someone there know if, look, if you're getting tired or feel
7   you can't -- you're standing too long, and we can find a chair
8   to let you sit down while the testimony is being taken here.
9            So, okay, and you can go ahead and proceed with your
10  witness then, Ms. Pekkala.
11           MS. PEKKALA:  Thank you, Your Honor.  The Government
12  calls Carlos Soto with the FBI.
13           THE COURT:  Okay.
14       (Pause in the proceedings.)
15       (Witness sworn.)
16           THE COURT:  Okay.  And, Agent Soto, if you could
17  please be sure to speak kind of directly into the microphone
18  there to be sure everyone can hear you okay, sir.
19           THE WITNESS:  Yes, sir.
20           THE COURT:  Thank you.
21                DIRECT EXAMINATION OF CARLOS SOTO
22  BY MS. PEKKALA:
23  Q    Good afternoon.  Could you please state your name and
24  your -- and who you work for on the Record, please?
25  A    Yes, my name is Carlos Soto, I'm a Border Patrol Agent,

1    Intelligence, assigned to the Federal Bureau of

2    Investigation's Violent Crime Squad.

3    Q    And in your role with the Violent Crime Squad did you

4    work on a case involving Gilberto Molina, Alfredo Gonzalez and

5    Alvaro Rodriguez?

6    A    Yes.

7    Q    Could you tell the Court about that investigation.

8    Where -- when did it start?

9    A    In late August we received information from a victim with

10   regards to a plot to kidnap him and to -- and get him to sign

11   over paperwork for a marble quarry in Mexico that he owns, and

12   then murder him, kill him after that.

13   Q    And this victim that came to you all what are his

14   initials?

15   A    His initials are J.V.

16   Q    And what did you learn after this -- was it the victim

17   that came to you or someone else that came to you?

18   A    So the information came from the -- also a confidential

19   informant who wanted -- who advised the victim that they had

20   hired him to carry out this plot against him.

21   Q    And once the FBI learned of this plot what happened next?

22   This is late August.  Right?

23   A    That is correct.

24   Q    So what was the next step after that?

25   A    So the next step after that FBI agents met with the

1   confidential informant who provided us information about the

2   plot with regards to them trying to hire him so that he -- so

3   that they could kidnap him in Mexico and so that they could

4   get him to sign over a marble quarry and then kill him.

5   Q    So I'm going to break this down a little bit, because

6   there's a lot of thems and hims in what you're talking about.

7   I just want to make sure it's clear.  So the person, the him

8   who has the marble quarry, is that the victim?

9   A    That is correct.

10  Q    And so the victim, just to clarify, is J.V.

11  A    That is correct.

12  Q    So if I understood what you said correctly, the plot was

13  to kidnap J.V. so that J.V.'s marble quarry would be taken

14  from him?

15  A    Yes.

16  Q    And who was creating this plot?

17  A    Gilberto Molina.

18  Q    And after -- after the FBI learned about this plot and

19  heard from a cooperating defendant or a confidential informant

20  what did the FBI do to further investigate this crime?

21  A    So with that it was -- we went ahead and obtained a

22  recording that he had did with Mr. Molina and Mr. Gonzalez,

23  Alfredo Gonzalez, and so on September 8 Molina called the

24  confidential informant to come out to Molina's house so that

25  they could meet.  The CI traveled to Molina's residence in

1    Mission, Texas and recorded the subsequent conversation.  The

2    CI asked Molina if he was still interested in kidnap -- in the

3    plan to kidnap J.V. --

4    Q    Can I --

5    A     -- which is the victim.

6    Q    Can I pause you for a second?

7    A    Yes.

8    Q    On September 8, 2020 was this confidential informant

9    recording this meeting, and how -- in person or over the phone

10   or how was it being recorded?

11   A    It was recorded on a device that he had.

12   Q    And --

13   A    An electronic device.

14   Q    And how do we know, or did you know, the FBI, that the

15   other person who as at this meeting with our confidential

16   informant was, in fact, Gilberto Molina?

17   A    We were able to listen to him during that time.

18   Q    And did the confidential informant know Mr. Molina?

19   A    Yes, he did.

20   Q    And was he able -- the cooperating defendant or

21   confidential informant also able to confirm the identity of

22   this Gilberto Molina?

23   A    Yes, that is correct.

24   Q    So in the scope of the September 8 meeting what was

25   discussed?

1    A    So it was discussed that in a -- as a ruse that if they

2    remembered the job that they had requested him to do, which

3    was to kidnap Molina so that they can get him to -- sorry --

4    Q    I'm sorry --

5    A     -- correction, so that they could kidnap the victim, in

6    this case J.V., so that they could get him kidnapped, get him

7    to sign over the paperwork for the marble quarries and then

8    kill him.

9    Q    So if I understood what you're saying correctly, the plot

10   had been discussed prior to September 8.  Right?

11   A    That is correct.

12   Q    Had it been also discussed prior to late August?

13   A    That is correct.

14   Q    So on September 8 when the confidential informant met

15   with Mr. Molina was the plot discussed in further detail?

16   A    Yes.

17   Q    Can you describe a little bit about what that discussion

18   entailed?

19   A    Yes, so the confidential informant informed Molina that

20   he had a friend that was -- that had hired somebody to build a

21   palapa for him in Mexico and that it so happened that the

22   victim had showed up to perform that job that they needed that

23   they -- to build a palapa.

24   Q    And was this the ruse that you were referring to?

25   A    Yes, that is correct.

Q    Do you know why the confidential informant gave that ruse?

A    That was because he was -- I do not know.

Q    Okay.

A    I do not know.  So -- were you going to ask something else?

Q    Does the confidential informant know the victim?

A    Yes, that is correct.  So the confidential informant knows the victim and had told the victim what was going to -- what they had hired him pretty much to do.

Q    Uh-huh.  So the confidential informant ruses Mr. Molina and tells Mr. Molina that the victim is in Mexico.

A    That is correct.

Q    And so what happened after Mr. Molina learned of that fact?

A    He told him that -- and if I remember correctly going to all this, is that he was wanting to execute the kidnapping so that they can sign over the paperwork and kill him.

Q    Was anyone else present at this meeting besides the confidential informant and Gilberto Molina?

A    During the first meeting it was Molina and the confidential informant.

Q    And the first meeting being the one on September 8.

A    That is correct.

Q    How did that meeting end?

1  A    That meeting ended where they were -- that meeting ended

2  that that's what they were going to want to do, they  were

3  going to actually carry out the plot to kidnap him, the

4  confidential informant was going to get back to his people in

5  Mexico to discuss the matter with regards to getting -- going

6  through the motions as far as kidnapping him and getting him

7  to sign and getting all that stuff into place to then at some

8  point get him turned over to over -- another group of people

9  that Molina and Gonzalez knew who would actually carry out the

10  killing.

11  Q    Was Mr. Gonzalez present on the September 8 meeting?

12  A    I don't believe so.

13  Q    After this meeting on September 8 what happened next?

14  A    After that they met again on September 10.  The CI

15  contacted Molina and they met with Mr. Gonzalez as well and

16  another subject by the name of Alvaro Rodriguez.

17  Q    What's Mr. Gonzalez's first name?

18  A    Mr. Gonzalez's first name is going to be Alfredo

19  Gonzalez.

20  Q    Is Alfredo Gonzalez also known as something else?

21  A    He's also known as Chino.

22  Q    And have you had a chance to review the recordings that

23  are referenced, or that you've referenced already prior to

24  testifying today?

25  A    Yes.

Q    Is the name Chino mentioned in any of these recordings?

A    Yes.

Q    So with this meeting between Gonzalez, also known as Chino, Mr. Molina, and I believe you said Mr. Rodriguez was present as well?

A    That is correct.

Q    Along with the confidential informant.

A    That is correct.

Q    What happened at this meeting?

A    Okay.  At this meeting that occurred on September 10 the CI met with Mr. Molina, Gonzalez and Alvaro Rodriguez at Molina's residence.  This meeting was recorded.  Gonzalez and Molina provided the CI information on the location of the victim's quarry.  Rodriguez advised that he was working with contacts in Mexico to help in preparing the paperwork that was going to be necessary so that they can get the proper paperwork to take over the marble quarries, so that they can prepare it and have it ready to give it back to the CI so that the CI could take it to his friend in Mexico where they would then have the victim sign that document to take over that property.

Q    So just to clarify, Mr. Rodriguez was the one that was doing that?

A    Yes, he was the one who has the contact in Mexico to obtain that paperwork.

Q    And what about Mr. Rodriguez, did he receive or place any calls to anyone in relation to trying to get the necessary information for the papers?

A    Yes, during the recording Mr. Rodriguez receives a call from a subject in Mexico, as he mentioned in the recording, who said that he would be able to obtain the proper documentation, the exact locations, so that he could be able to obtain the documents that were needed for signatures.

Q    Did Mr. Rodriguez mention anything else about talking on cellular phones in this recording?

A    Yes, he also mentioned that they should limit the amount of phones that we used because it was a very serious offense and that they should not be talking about this over the phone.

Q    Did they mention anything about the consequences of talking on the phone?

A    Yes, because he was already previously in custody in jail for to her offenses.  So he knew it was going to be a big consequence with talking over this plot over the phone.

Q    What about Mr. Gonzalez, also known as Chino, what was he doing in this meeting?

A    In this meeting he was present, in the recording you can clearly see him being present during this meeting.

Q    And what, if anything, was Mr. Chino doing on this recording?  Was he saying anything or doing anything?

A    At that time I -- there was a series of recordings, I

1    cannot recall that, what he was doing at that time.

2    Q    This was on September 10?

3    A    Yes.

4    Q    Did Mr. Chino -- or, I'm sorry, Chino, Mr. Gonzalez, what

5    did you understand his role to be in the scope of this

6    conspiracy?

7    A    So his role was that he had contacts that he -- that were

8    known to Mr. Molina and Chino, Mr. Gonzalez, that they refer

9    to them as chavalos, that they had a chavalo, and those

10   chavalos were going to be the people that had contacts and

11   ties in Mexico who would carry out the actual murder, and

12   possibly, you know, the -- because of the fact that they had a

13   ranch in Mexico that they would keep him there at that ranch.

14   Q    And by keeping him there at that ranch are you referring

15   to the victim?

16   A    Yes, the victim.

17   Q    So on September 10, 2020 did Mr. Gonzalez express

18   anything about his connections in Mexico and how it would

19   affect this conspiracy during that meeting?

20   A    I cannot recall if it was on that -- during that

21   conversation that occurred on September 10.

22   Q    Do you recall him ever mentioning anything like that?

23   A    Yes, I do.

24   Q    Do you remember generally what it was that he said to

25   that effect?

A    He said that he had the connections, the chavalo that
would be able to carry out the actually killing, or the
murder.

Q    So after this meeting on September 10 -- or let me
rephrase.  How did the meeting on September 10 end?

A    The meeting ended that Mr. Rodriguez was going to go back
and get the paperwork going, and then that were going to meet
again.  And during that time the confidential informant
mentions several times that it was going to be clear -- that
it was going to be clear that the -- it was going to -- that
his friend in Mexico would be kidnapping the victim and
getting him to sign the paperwork and then killing -- and then
the other people that they referred to as the chavalos would
then be killing him.

Q    Did they discuss these -- Molina, Gonzalez, Rodriguez,
was there any discussion about how these hitmen would be
compensated?

A    Yes, they --

Q    Or the kidnappers?

Q    -- they would be compensated with earnings from the
marble quarries.  They had a subject that they named as
Italiano (phonetic), who would be able to work the quarries in
Mexico and the Italiano would keep 80 percent of the earnings
and 20 percent would then be provided to Mr. Molina, who would
the pay the -- a portion of that 20 percent to Mr. Gonzalez,

1    which is Chino, Mr. Rodriguez, the confidential informant, the

2    confidential informant's friend and the chavalos, who were

3    then -- who were also part of it.

4    Q    So beyond the proceeds that would be gained from the

5    business were this plot successful, was there any other

6    discussion about money or financial payments to people to help

7    with the kidnapping or the murder?

8    A    Yes, during the subsequent -- I'm not sure if it's going

9    to be also on September 10, but,  yes, they discussed that

10   they would potentially pay the confidential informant's friend

11   $5,000 to carry out the kidnapping, the signature of the

12   paperwork and the murder as well.  And they were going back

13   and forth as to whether the friend would be the one who would

14   also do the murder after kidnapping him and getting him to

15   sign the paperwork, or if the chavalos would do the actual

16   murder.  And so they came to an agreement to where they would

17   at least pay the confidential informant's friend $1,000 to

18   carry out the -- or to at least as a down payment for this to

19   happen.

20   Q    And was there any discussion about what was expected for

21   this down payment?  Was that supposed to pay for the full

22   blown murder or the kidnapping or something else?

23   A    That was supposed to be for the kidnapping and for them -

24   - for the signature on the paperwork.

25   Q    So after this meeting on September 10, 2020 what happened

1   next?

2   A    From there the confidential informant collected $1,000

3   from Mr. Molina at his residence.  And it was understood that

4   with that $1,000 it was going to initiate the process to get

5   the victim, the potential victim here kidnapped and the

6   paperwork signed.

7   Q    Do you know when that happened?

8   A    I would have to go back to my notes, but I believe it was

9   on or about September 17 when that happened.

10  Q    And do you know or remember how that transfer of money

11  happened?

12  A    Mr. Molina gave $1,000 to the confidential informant.

13  Q    Where --

14  A    At his house, at Mr. Molina's house.

15  Q    Do you know if it was in cash or in check or electronic

16  payment?

17  A    It was in the form of cash, but then Mr. Molina asked the

18  confidential informant to also sign a check that was already

19  written out.

20          MS. PEKKALA:  Your Honor, if I may just clarify.  Is

21  Zoom still connected?  We just have a black screen over here,

22  I want to make sure.

23          THE COURT:  Yeah.

24          MS. PEKKALA:  Okay.  I don't know if they can see

25  us, or see me.

1       THE COURT:  Okay.  So you okay there at the --

2       MS. TAYLOR:  Actually, here I am.  I don't see the

3  AUSA anymore, but I can still hear her just fine.

4       THE COURT:  Okay.  So we ought to be okay.  Let me

5  just see if we can figure out what happened.

6       MS. PEKKALA:  Would Ms. Taylor also be okay with not

7  being able to see the witness in the event that we have this

8  technical difficulty?

9       MS. TAYLOR:  Yes, we can go forward.

10      THE COURT:  Okay.  Thank you.

11  BY MS. PEKKALA:

12  Q    So Mr. -- you were talking about Mr. Molina giving $1,000

13  cash to the CI.

14  A    Yes, that is correct.

15  Q    And what were you saying about the check?

16  A    So aside from the $1,000 Mr. Molina asked the CI to sign

17  a check, kind of like a receipt that he had given him those

18  $1,000.

19  Q    After that meeting what happened next?

20  A    After that meeting it would -- I would have to go back to

21  my notes, but after that meeting when -- after the $1,000 were

22  given, it was expected that then the confidential informant's

23  friend was going -- it was agreed upon that he was then going

24  to go ahead and kidnap him and -- so that they can have him

25  sign the paperwork.

1    Q    So just to clarify, this whole plan to kidnap and murder

2    J.V. was so that Molina, Rodriguez and Gonzalez could get or

3    gain or acquire what?

4    A    Proceeds from the mine, 20 percent.

5    Q    In the course of your investigation, if you know, is this

6    marble quarry a particularly highly earning business or worth

7    some value, some monetary value?

8    A    It's -- according to the victim when we spoke to him, it

9    produces a lot of marble and the way he explained it is that

10   some of the marble is caught up -- is cut up into big blocks

11   and from there out of each block they cut it up into 100

12   different sheets and each sheet is then worth about $1,200,

13   and that there was large quantities of those blocks that the

14   mine had produced.

15   Q    Mr. Rodriguez, the individual who was helping with the

16   paperwork, are you aware of any connections to gangs or

17   cartels that he may have had in Mexico?

18   A    Yes.  Yes, I do have an intelligence report where he was

19   documented as having ties to the cartels in Mexico, and during

20   his -- during an interview with him he did mention that he was

21   affiliated to El Toro, which was a cartel I believe that is in

22   the Reynosa area in Mexico.

23   Q    What about Mr. Gonzalez, also known as Chino, are you

24   aware of any ties with the cartels in Mexico?

25   A    Yes, ma'am.  So the chavalos that were going to be used

1    to carry out the actual murder were the connections that

2    Mr. Gonzalez, Chino, had and based on the recordings it was

3    understood that those subjects had connections to family in

4    Mexico who owned a ranch and were part of the mafia.

5    Q    And what about Mr. Molina, are you aware of any

6    connections that he may have had in Mexico like that?

7    A    I'm not aware.

8    Q    Do you know what Mr. Molina does for work?

9    A    I believe he's a truck driver.

10   Q    Do you know if that truck company operates

11   internationally?

12   A    My understanding is that the victim, J.V., and Mr. Molina

13   had previously worked and that the blocks, or the marble that

14   was coming from Mexico from the victim's mine, Mr. Molina was

15   in charge of transporting those blocks, or the marble here

16   within the United States to different areas.

17   Q    And are you aware if during the course of Mr. Molina's

18   work as a truck driver and his work with this marble quarry,

19   if he established strong contacts in Mexico that may have been

20   part of this conspiracy?

21   A    I'm not aware of that.

22           MS. PEKKALA:  Pass the witness.

23           THE COURT:  Okay.  Thank you.

24           Ms. Taylor?

25           MS. TAYLOR:  Yes, Your Honor.  Thank you.

1       CROSS-EXAMINATION OF CARLOS SOTO

2    BY MS. TAYLOR:

3    Q    Good afternoon.  Just a moment, sorry.

4    A    Good afternoon.

5    Q    Good afternoon, Agent Soto.

6    A    Yes, ma'am.

7    Q    Let's see, just to clarify you talked a little bit about

8    some of the meetings that took place between the CI and

9    Mr. Molina.  Did those --

10   A    Yes.

11   Q     -- where did those meetings take place?

12   A    At Mr. Molina's house.

13   Q    And

14   A    In Mission, Texas, sorry.

15   Q     -- where is Mr. Molina's house?  Sorry, is Mr. Molina's

16   house in the Southern District of Texas?

17   A    Yes, ma'am, it's on -- it's in Mission -- it's located on

18   Glasscock Rock in Mission, Texas.

19   Q    Thank you.  Thank you, Agent.  The first meeting would

20   have been some time in late August.  Is that what you

21   testified?

22   A    Yes.

23   Q    Was that meeting between Mr. Molina and the CI also

24   recorded?

25   A    It was a meeting that occurred on -- to my knowledge on

1   September 8.

2   Q    So September 8 was the first meeting between the two --

3   of the two --

4   A    That was recorded.

5   Q     -- ever recorded.

6   A    Correct.

7   Q    Are you aware -- what is the relationship between the CI

8   and Mr. Molina?

9   A    My understanding is that they worked together, both for

10  the victim, J.V.

11  Q    So the meeting that was recorded on September 8 how was

12  that recorded, with audio only?

13  A    Yes.

14  Q    And did the CI wear a wire, is that how it's recorded?

15  A    The CI had an electronic device.

16  Q    Okay.  And so if I'm understanding this correctly, you

17  testified before about it was a ruse about the CI telling

18  Mr. Molina that the victim, J.V., was in Mexico.  This entire

19  time was the alleged victim, J.V., where was he?

20  A    My understanding is that he was here in the United

21  States.

22  Q    Okay.  Is that -- had that been verified by you?

23  A    Yes, he was --

24       MS. PEKKALA:  Objection, Your Honor, outside the

25  scope of this hearing.

1    THE COURT:  I'm going to allow that, there's a lot

2    of detail that came in and so I mean we don't want to belabor

3    anything because this is not a trial or a discovery hearing,

4    but we've gone through a lot of detail, so I think that one's

5    okay.

6    THE WITNESS:  Okay.

7    THE COURT:  If you can answer, if you remember the

8    question.

9    THE WITNESS:  Can you repeat your question, please?

10   BY MS. TAYLOR:

11   Q    Yeah, Agent, just were you able to verify the alleged

12   victim, J.V.'s, whereabouts while this was going on, during

13   the investigation?

14   A    He was here in the United States.

15   Q    Okay.  Thank you.  As far as the $1,000 cash payment that

16   Mr. Molina gave to the CI, is that in evidence, that cash?

17   A    Yes.  Yes, it is.

18   Q    And -- okay.  And I was a little bit confused about the

19   part about a check.  You said that Mr. Molina had the CI sign

20   a check?

21   A    Yes, that is correct.  He gave him the $1,000 in cash but

22   he also had a check that was already pre-filled and he

23   requested the CI to sign that check as well.

24   Q    Who was the check made out to?

25   A    I would have to go back and look at the check to give you

1    a correct answer on that.  But I believe that it was made out

2    to the actual CI.

3    Q    Okay.  So going to the first recorded meeting that took

4    place in Mr. Molina's house in Mission, Texas, about how long

5    is that recording?

6    A    I would say that it's between 5 to 10 minutes.

7    Q    Okay.  And the only two people present were Mr. Molina

8    and the CI?

9    A    Yes.

10   Q    Okay.  And then at the second meeting on September 10 who

11   was present?

12   A    Mr. Molina, Mr. Gonzalez and Mr. Rodriguez.  And the CI.

13   Q    Okay.  And what is the approximate length of that

14   recording?

15            MS. PEKKALA:  Objection, Your Honor, it's outside

16   the scope.

17            THE COURT:  I'm going to allow that.  If you know,

18   you can answer, Agent.

19            THE WITNESS:  That one is going to be -- I would

20   have to say that it's also anywhere between 5 to 10 minutes,

21   possibly 15 minutes.

22   BY MS. TAYLOR:

23   Q    Okay.  And in that meeting, just so that -- I'm

24   clarifying, was a specific address in Mexico mentioned, or no?

25   A    There wasn't -- so the victim was going to be in a

1    certain area in Mexico where he was working, where he was to
2    be working as part of the ruse, at a ranch in Mexico, I
3    believe it was Cardelita (phonetic) where he was supposed to
4    be working.
5    Q    I see.  And so on September 10 at that meeting there
6    still needed to be more details in order to -- and more plans
7    needed to be made in order to carry out this alleged
8    kidnapping plot.  Is that --
9    A    Yes, ma'am.
10   Q    -- correct?
11   A    Yes, and now that I remember, when you mentioned
12   addresses, also they also discussed the location of the quarry
13   and that they believed that it was in Abasolo.
14   Q    Abasolo?
15   A    Yes.
16   Q    Okay.  And so then the purpose of the September 16
17   meeting was to discuss payments?
18   A    Yes, that is correct.
19   Q    Okay.  And as of September 16 to your knowledge in
20   regards to this investigation no money had exchanged hands?
21   A    Prior to that?
22   Q    Correct.
23   A    Correct.
24   Q    Okay.  And then who was at the September 16 meeting, was
25   it the same people that were at the September 10 meeting?

1    A    I don't think that Mr. Rodriguez was there.  For the

2    payment --

3    Q    Okay.

4    A     -- it was going to be Mr. Gonzalez, Mr. Molina and the

5    CI.

6    Q    Okay.  And then for the final (indiscernible) on

7    September 16 no money was exchanged either.

8    A    No, you said -- I believe you asked if there was any

9    monies exchanged prior to September 16, but on September 16

10   there was money exchanged.

11   Q    There was money exchanged or discussed?

12   A    There was money discussed and exchanged.

13   Q    Oh, okay.  What money was exchanged on September 16?

14   A    $1,000.

15   Q    Oh.  Okay.  Maybe I'm confused.  I thought that

16   happened -- what happened on September 17, was $1,000 paid on

17   September 17?

18   A    Yes, that is correct.  The dates are very close, and I

19   would have to say that on September 16 they discussed the

20   $1,000 and then on September 17 the $1,000 were actually

21   exchanged.

22   Q    Okay.  And the $1,000 was the only payment during the

23   course of this investigation?

24   A    Yes, ma'am.

25   Q    Okay.  You know, was the CI being paid for this work that

1    he was doing with the --

2    A    No.

3    Q     -- like from your agency?

4    A    No, ma'am.

5    Q    No.  Was he trying to work off charges or anything of

6    that nature?

7    A    He is a friend to the victim and his motivation was to --

8    he's also on probation, on federal probation and his

9    motivation was not to get into trouble with federal probation.

10   And that's the reason why he also wanted to work, because he

11   didn't want to get in trouble with federal probation.

12   Q    Okay.  Was there anything mentioned at all about a deed

13   to a house?

14   A    Yes.

15   Q    And whose house would that be?

16   A    To Mr. Molina's.

17   Q    Okay.  And how did that come into play?

18   A    My understanding is that the house was Mr. Molina's,

19   there was a deed to Mr. Molina's house that was placed under

20   the CI's name at some point.

21   Q    Okay.  And so is there discussion that Mr. Molina can get

22   the deed to his house back somehow?

23   A    Not that I can recall.

24   Q    Okay.  Did Mr. Molina -- sorry, was Mr. Molina

25   Mirandized?

1    A    After the arrest, yes.

2    Q    Yes.  Okay.  And did he waive his Miranda rights?

3    A    I was not part of that interview, but I believe he did

4    waive his Miranda rights and gave a statement.

5    Q    Oh.  Okay.  And was his statement in -- well, first off,

6    sorry, to go back to the meetings that we were talking about

7    before that were recorded, were those conversations in English

8    or Spanish?

9    A    They were in Spanish.

10   Q    Okay.  And then as far as Mr., if you know, Mr. Molina's

11   statements post-Miranda was that in English or Spanish?

12   A    At the beginning I could not hear you correctly.  Could

13   you repeat your question?

14   Q    Yes, sir.  In regards to Mr. Molina's post-Miranda

15   statement was that in English or Spanish?

16   A    I'm not aware of a post -- oh, correction, yes, that was

17   in English.

18   Q    Okay.  And was that statement recorded?

19   A    Yes, it was.

20   Q    And what's the approximate length of that conversation,

21   that interview?

22   A    I did not conduct that interview so I would not be able

23   to tell you that.

24   Q    Okay.  Yes, sir.  I think you maybe alluded to it a

25   little bit earlier.  Do you know the approximate value of this

1    rock quarry that's in Mexico?

2    A    I don't know the approximate value, what I do know is

3    that it was producing large amounts of marble blocks that

4    were -- that if you cut them up, according to the victim,

5    they -- it comes up to about 100 sheets and each of those

6    sheets are worth about 1,200 US dollars.  And he said that

7    there was many of those blocks at his -- at that property.

8    Q    Okay.  And so just also to clarify, no kidnapping

9    actually took place.  Is that correct?

10   A    Correct.

11   Q    Okay.  That's all I have.

12            MS. TAYLOR:  Pass the witness.

13            THE COURT:  Okay.  Mr. Pekkala, anything else?

14            MS. PEKKALA:  Nothing further, Your Honor.

15            THE COURT:  Okay.  Thank you.

16            And so I guess, Agent Soto, you can have a seat in

17   the back for at least a couple of minutes and we may need you

18   again I guess, depending on what Mr. Gonzalez does here.

19        (Witness steps down.)

20            THE COURT:  But as far as the issue of probable

21   cause as to Mr. Molina, Ms. Taylor, did you have any argument

22   you wish to present on that at this time?

23            MS. TAYLOR:  Yes, Your Honor.  According to the

24   testimony there were maybe three recorded conversations

25   between the CI and Mr. Molina.

1          (Pause in the proceedings.)

2               MS. PEKKALA:  I think we lost her.

3               THE COURT:  I think we lost you, if you're still

4     there, Ms. Taylor?

5          (No audible response.)

6               THE COURT:  Hmm, I don't see her.

7          (Pause in the proceedings.)

8               THE COURT:  Hopefully she's returning.

9          (Pause in the proceedings.)

10              THE COURT:  Well, I think we've lost Ms. Taylor.

11    Oh, there she is.  Oops, you need to un-mute.

12              MS. TAYLOR:  Sorry.  Sorry about that, Your Honor.

13    I was disconnected on technical.  Can everyone hear me now?

14              THE COURT:  Yes.

15              MS. TAYLOR:  I think just the argument, Your Honor,

16    was that I think there's some question maybe about the reason

17    for the $1,000 cash payment, if the CI had the deed to

18    Mr. Molina's home, and there's something else about a check

19    and really the details to that I mean aren't very clear.  Your

20    Honor, I don't know that the Government has met their burden

21    of probable cause at this hearing to show that specifically

22    that Mr. Molina committed a crime or the conspiracy to commit

23    kidnapping.

24              Specifically the agent testified on direct that he

25    had no evidence of Mr. Molina being involved in organized

1    crime.  I didn't hear really anything directly linking

2    Mr. Molina to this kidnapping plot, besides of course a CI who

3    may have had his own motives for why he would cooperate with

4    agents in order that he not get in trouble himself.  And, Your

5    Honor, we would just ask the Court to take all of the

6    testimony into consideration.

7              THE COURT:  Okay.  And it looks like I think we

8    might have lost LaVilla for a couple of minutes there too.

9    Yeah, I don't see -- do you all see LaVilla anymore?

10             THE CASE MANAGER:  No.

11             MS. PEKKALA:  It looks like someone's in the waiting

12   room.

13             THE COURT:  Let's see.

14             THE CASE MANAGER:  I don't see him.  There they are.

15   Okay.

16        (Pause in the proceedings.)

17             UNIDENTIFIED SPEAKER:  (Indiscernible), but we're

18   back online.

19             THE COURT:  Okay.  Thank you.  And --

20             MS. TAYLOR:  So, Your Honor, just there is no actual

21   kidnapping, especially a conspiracy to commit kidnapping, and

22   so Mr. Molina would have to take a substantial step towards

23   furthering that kidnapping.  And here I think the Government

24   is using the $1,000 cash payment, and our argument is it's not

25   clear what that payment was intended for.  That's all we have.

1          THE COURT:  Okay.  And, Ms. Pekkala, as far as the

2     Government's position on the probable cause issue?

3          MS. PEKKALA:  Your Honor, the Government's met its

4     burden, there's ample evidence of Mr. Molina's agreement to

5     commit kidnapping as well as possibly murder.  He committed

6     multiple overt acts in furtherance of that conspiracy, namely

7     that he contacted multiple co-conspirators about this,

8     organized the plot, had them over to his house to discuss the

9     plot, and even went so far as to gather some money to pay so

10    that a hitman could be compensated.

11         We believe that this more than satisfies the burden

12    for probable cause.  And although that no actual kidnapping

13    took place, fortunately, 18 USC 1201(c) punishes conspiracy to

14    kidnap the same as it does as the (indiscernible) offense and

15    we believe that we've met those elements.

16         THE COURT:  Okay.  And on the issue of probable

17    cause I'll just note that the Government has a low burden to

18    meet at this early stage.  The question is whether there's a

19    probability to believe that a crime was committed and the

20    particular defendant was involved with that.  And so it's

21    obviously a much lower standard that would apply -- than would

22    apply in order to convict a person.

23         I do find based on the testimony of Agent Soto that

24    there is probable cause here.  Based on the testimony the

25    Defendant, Mr. Molina, is heard on recordings discussing the

1   kidnapping and taking of property from the alleged victim, as
2   well as allegedly making plans to kill the victim ultimately.

3           And certainly, you know, if the recordings -- and
4   obviously as the case goes forward the defense counsel will be
5   able to have access to those and be able to look at those more
6   carefully, but based on the description by the agent here
7   there's certainly sufficient evidence of probable cause that
8   Mr. Molina was involved in a conspiracy to commit kidnapping.
9   And it appears at this stage that the evidence is pretty
10  significant in that he was recorded during these meetings.

11          Obviously there's also other issues that might be
12  raised, as Ms. Taylor alluded to some points that, you know,
13  raise some possible questions perhaps.  But those things would
14  be addressed as this matter proceeds.  And I do find the
15  probable cause standard has been met.

16          So with that we'll need to address the issue of bond
17  as to Mr. Molina, and we'll go ahead and reset that.

18          And, Ms. Taylor, how much time do you think would be
19  appropriate here?  If we set this for next Tuesday or
20  Wednesday is that a sufficient time, or what are you
21  requesting?

22          MS. TAYLOR:  Depending on the escalation, Your
23  Honor, I can provide (indiscernible) with my client's son's
24  phone number and they can corroborate that information.  So we
25  don't need that much time.

1           THE COURT:  Okay.  So we'll set this for Tuesday at

2    three o'clock and for the bond issue as to Mr. Molina.  Was

3    there anything else that we ought to take up right now then as

4    to him in this case?

5           MS. PEKKALA:  Yes, Your Honor, the Government --

6           MS. TAYLOR:  (Indiscernible).

7           MS. PEKKALA:   -- the Government would just like to

8    put on the Record that the victim was notified of this hearing

9    and elected not to be present.

10          THE COURT:  Okay.  And that's fine.  So we'll go

11    ahead and, Mr. Molina, I hope you stay safe and well, sir, and

12    we'll have your hearing continued on Tuesday.  And we'll go

13    ahead and leave Mr. Molina with the Marshals at this time.

14    Thank you.

15          MS. TAYLOR:  Thank you, Your Honor.  May I be

16    excused?

17          THE COURT:  Yes, ma'am.  Thank you.

18      (Hearing adjourned 4:49 p.m.)

19

20

21

22

23

24

25                        * * * * *

1            *I certify that the foregoing is a correct transcript*

2    *to the best of my ability due to the condition of the*

3    *electronic sound recording of the ZOOM/telephonic proceedings*

4    *in the above-entitled matter.*

5    */S./   MARY D. HENRY*

6    *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

7    *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

8    *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

9    *JTT TRANSCRIPT #63622*

10    *DATE FILED:   MARCH 25, 2021*